UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CHRISTOPHER HALL                                                                          PLAINTIFF
as Administratrix of the Estate of William Allen Young, Jr.

v.                                                                           No. 3:17-cv-481-BJB-RSE

RUSSELL BRAUN, ET AL.                                                                   DEFENDANTS

## OPINION AND ORDER

While responding to a suspected break-in in southern Louisville, police officers noticed an individual hiding in an abandoned house next door. The officers failed to coax the individual outside, so they removed plywood from the front door and entered, announcing themselves as police. Minutes later, when the officers reached the second floor, they spotted William Young crouched in a corner. Young immediately lunged at the first officer with a metal skewer. Three officers responded by shooting Young at very close range. Young died soon after. Practically all of this is captured on body-camera footage.

Young's Estate sued Louisville Metro Government, the then-Chief of Police, and the three officers who shot him, claiming that the officers violated Young's Fourth Amendment right to be free from excessive force. The Estate hinges its excessive-force claim against the officers—the only defendants left in the case—on the officers' allegedly unreasonable actions *before* the shooting: their warrantless entry and subsequent walk up the stairway. But binding precedent confines the analysis to the use of force itself, not to previous actions that might have violated different constitutional rights earlier in the chain of causation. And the use of force here was indisputably reasonable; the Estate *agrees* that the officers' reactions protected themselves after Young attacked. Given these undisputed facts and the Circuit's binding precedent, the Court grants the Defendants' motion for summary judgment.

### I.   The Record Evidence

The parties largely agree on what happened. A police body camera recorded the most relevant events. To the extent the parties dispute those events, the Court "view[s] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). For all disputed facts *not* captured on camera, the Court considers the facts in the light most favorable to the Estate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[O]n summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." (cleaned up)).At 10:30 p.m., the Louisville Metro Police Department received a 911 call reporting a potential break-in at a house on Oleanda Avenue in southern Louisville. Officer Richardson Deposition (68-7) at 7:14–15 (describing the February 11, 2017 incident). LMPD officers responded, interviewed the residents of that house, and

searched the area. *Id*. at 10:5–11:16. The residents told the police that the person they suspected of breaking in had fled to a vacant house next door. *Id*. at 11:9–13. This house was long abandoned; it had a boarded-up front door, broken windows, and a decrepit exterior. The responding officers called for back-up and began scouring the area in search of the suspect. *Id*. at 11:16–19. An officer saw someone look out from the second-floor window of the abandoned house. *Id*. at 13:1–2. Police officers attempted to call to the person from outside, but heard no response. Officer Braun Deposition (DN 68-1) at 24:6–9; LMPD Investigation Report (DN 69-3) at 129:474–479; Officer Braun Bodycam (DN 65-2) at 7:20–27.

For reasons that aren't entirely clear from the record (perhaps to arrest the person for trespassing, perhaps to question him about the alleged burglary), the officers decided to enter the abandoned house.[1] At least two of the responding officers, Russell Braun and Paige Young, strongly suspected that William Young was the individual hiding in the abandoned house, though they did not know him by name. Young was 32 years old, homeless, and mentally ill. He often stayed in the abandoned house without permission. Christopher Hall Deposition (DN 68-3) at 26:13–27:7. The same two officers had previously encountered Young in the second floor of the same abandoned house a few months earlier. On that occasion, the officers entered the house in response to a complaint, found Young on the second floor, and asked him to leave. Young complied. Braun Dep. at 15:3–16:4. Both officers remembered that prior interaction as they entered the abandoned home on the evening in question. LMPD Investigation at 140:139–140, 159:315–160:324; Braun Bodycam at 14:27 (asking Officer Young "You remember where he was last time, right?").

The officers' entry into the house was noisy and lengthy. Officer Braun unscrewed the boarded-up front door. Braun Bodycam at 1:30–13:12 While Braun unscrewed the door, which took several minutes, he told another officer that Young "used to live here, apparently. Before it got condemned." *Id*. at 2:05. He also wondered aloud "how this guy keeps getting in." *Id*. at 5:35.

After he removed the door, Braun asked another officer if a K-9 dog could sniff the abandoned home for the suspect. *Id*. at 13:28. The K-9 officer, following Department policy, did not allow Braun to use the dog.[2] So the officers drew their weapons and entered the home. Officer Braun, the first officer to enter, immediately shouted out "Police! If you're in here, let us know!" *Id*. at 13:49. Ten seconds later, he again shouted "Police!" *Id*. at 14:00. He then positioned himself at the foot of the staircase leading to the second floor while the other officers searched the first

---

[1] The record indicates that at least one officer initially believed he could make an arrest for trespassing, but not for burglary, based on doubts that the individual hiding in the abandoned house had in fact broken into the home next door. *See* LMPD Investigation at 123:182–209, 155:110–127 (expressing doubt about whether a burglary in fact occurred); Braun Bodycam at 12:26–46 (discussing potential arrest for trespassing, but expressing doubt regarding potential burglary arrest). A partial version of Officer Braun's and Officer Young's bodycam footage is available online through the LMPD YouTube page at https://www.youtube.com/watch?v=HfzR0tbl0Yg. The Estate also cites YouTube, albeit a different channel, to refer to the bodycam footage. *See* https://www.youtube.com/watch?v=bAXCpglDEhg.

[2] LMPD policies do not permit the use of K-9 dogs when officers are responding to misdemeanors or entering abandoned homes. The record contains conflicting—and ultimately immaterial—information about which rationale animated the decision not to use the K-9 dog here. Braun Dep. at 35:21–36:8 (no felony offense); Officer McKinley Deposition (DN 68-5) at 23:1–24 (home was abandoned).

2

floor. After three minutes of searching, the officers determined the individual was not hiding on the first floor. *Id*. at 16:30.

The officers then lined up at the foot of the stairs and began walking up to the second floor in a single-file line with guns drawn. *Id*. at 16:39. Officer Braun walked up first. Several other officers, two of whom are defendants in this case along with Braun, followed just behind.

Officer Braun had a flashlight in one hand and a gun in the other. As he started up the stairs, he yelled "Police Department!" *Id*. at 16:41. Halfway up the staircase, he again yelled "Police!" *Id*. at 16:44. When he reached the top of the staircase, he stepped onto a small landing and scanned the dark room with his flashlight beam, moving from left to right. *Id*. at 16:50.

The officers' fatal encounter with Young lasted less than three seconds. As the beam reached the right side of the room, the light revealed Young crouched in the corner. *Id*. at 16:51. Young was—at most—ten feet away from Officer Braun. Young immediately stood up, holding a long, shiny object that both sides describe as a "metal skewer." Motion (DN 65-1) at 1; Response (DN 69) at 1; *see also* Officer Young Bodycam (DN 65-2) at 3:06, 4:07 ("metal rod"). He stepped aggressively toward Braun, skewer outstretched. Braun Bodycam at 16:53. The officers began to shout and Braun thrust out a hand to stop Young. But Young continued forward until he was inches away and then lunged at the officer's upper torso with the skewer. *Id*.; Young Bodycam at 3:07. When Young lunged, the three Defendant officers opened fire. Braun Bodycam at 16:54. Young was hit by the gunfire and collapsed backward. *Id*. Two officers immediately handcuffed him and searched the remainder of the second floor. Young died moments later. Braun shot himself in the hand during the commotion and quickly ran out of the house to receive treatment. Braun Dep. at 59:18.[3]

## II. This Lawsuit

Young's Estate[4] brought this lawsuit under 42 U.S.C. § 1983 against the Louisville Metro Government, then-Chief of Police Steve Conrad, and the three officers involved in the shooting. The Amended Complaint asserts violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution, as well as state-law claims of negligence, battery, and wrongful death. *See* Amended Complaint (DN 12). This Court previously dismissed the claims against Louisville Metro Government and Conrad for failure to make out a plausible claim for municipal or supervisory liability. *See* Order Granting Motion to Dismiss (DN 27). Only the three individual officers remain as defendants. They have moved for summary judgment on all remaining claims against them on the ground that the record establishes, beyond any genuine

---

[3] Braun testified that Young reached him with the skewer and injured his neck, Braun Dep. at 57:2–9, while the Estate denies this. Neither side points to any other support in the record, and that disputed factual assertion falls out of the analysis at this stage of the case.

[4] The named plaintiff in this action is Christopher D. Hall, William Young's brother and the executor of his estate. Young's mother, Reinella Kirilova, originally was the executor of Young's estate and the named plaintiff, but Hall took over as executor in 2019 and substituted into this case as the real party in interest. DN 43.

dispute, that the officers acted reasonably in responding to the attack with lethal force. *See* Summary Judgment Motion (DN 65).[5]

### III. Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure requires that a court grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." No "genuine dispute" exists if a reasonable fact-finder could not accept the nonmoving party's version of the facts, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, or if, even on the nonmoving party's version of the facts, the law would still require a judgment for the movant, *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

### IV. The Record Warrants Summary Judgment for the Defendants

Young's Estate asserts both federal and state claims against the officers. Its federal claim asserts Young's right under the Fourth Amendment (as applied through the Fourteenth) to be protected from excessive force,[6] while its state-law claims assert battery and negligence torts.

#### A. Fourth Amendment

**1. Use of force.** The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures." The law treats the sort of force used against Young as a seizure. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). If that use of force was unreasonable, the seizure violates the Fourth Amendment. *Id.* As authorized by 42 U.S.C. § 1983, Young's Estate seeks to recover damages against the officers for the alleged constitutional violation.

Courts have developed a "settled and exclusive framework for analyzing whether the force used in making a seizure" was reasonable. *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546

---

[5] Months after responding to Defendants' summary judgment motion, the Estate moved to supplement its response with a New York Times video describing a different police-involved shooting. *See* DN 73. The circumstances of a different case have no apparent relevance here, and the Estate's claimed overlapping policy violations are not relevant to disposition of this case. The Court grants the Estate's motion for leave to supplement its response, but rules that the supplement has no bearing on the issues before the Court.

[6] Although Hall's amended complaint asserted Fourth, Fifth, Eighth, and Fourteenth Amendment claims, he defends only his Fourth Amendment excessive-force claim at summary judgment. This choice was prudent: the Fourth Amendment applies directly to pre-arrest seizures. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."); *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010) ("The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that arise in the context of an arrest or investigatory stop of a free citizen, while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences. When neither the Fourth nor the Eighth Amendment serves to protect citizens, courts have applied the Fourteenth Amendment." (cleaned up)).

(2017). Courts examine the use of force "from the perspective of a reasonable officer on the scene," based on the totality of the circumstances. *Id*. (quoting *Graham*, 490 U.S. at 396). The relevant circumstances include (1) the severity of the crime, (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) whether the suspect was actively resisting arrest. *Graham*, 490 U.S. at 396. When the officer used deadly force, such force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11.

The Estate argues the officers unreasonably used deadly force against Young when they shot him as he charged at Officer Braun with a metal skewer. But the video evidence indisputably shows Young imminently threatened serious physical harm against Officer Braun, rendering deadly force reasonable under the circumstances. This was not a will-he-or-won't-he situation: Young did not respond to the officers' calls, hid in the dark, immediately lunged at Officer Braun when the flashlight revealed his position, and tried to stab him in the upper body with a metal skewer.

The metal skewer certainly could cause "serious physical harm." *See id*. The Estate doesn't seriously contest this point—nor could it. Officer Young's bodycam footage shows the metal skewer: a thin metal pole, perhaps a foot long, with a wooden handle. *See* Young Bodycam at 3:08.[7] The end appears sharp and pointed, akin to a fire poker. Given these features and the speed with which Young lunged at Officer Braun, the metal skewer undeniably could cause serious physical harm to Officer Braun. *Cf. Chappell v. City of Cleveland*, 585 F.3d 901, 909–16 (6th Cir. 2009) (granting summary judgment when decedent moved quickly toward police officers with a knife). The officers' gunshots almost certainly prevented Young from stabbing and seriously injuring Officer Braun.

The Estate and its expert witness *both agree* the officers reasonably used deadly force at the moment of the shooting: "at that moment" when the officers shot Young, the Estate's expert stated, Braun was "in imminent danger." Expert Deposition of Roger Clark (DN 65-5) at 74:24–25. And the Estate, in its summary judgment response, concedes that "Plaintiff does not dispute that under the circumstances, when [Young] rushed Defendant Braun with a metal skewer, Defendants had left themselves no option but to fire their weapons." Response at 17.

These concessions alone essentially decide the case. When the officers made the "split-second judgment" to deploy deadly force, they confronted a hidden suspect suddenly lunging at Officer Braun with a sharp pole. *See Livermore v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) ("focus[ing] on the 'split-second judgments' made immediately before the officer used allegedly excessive force"). Young immediately threatened the officers' safety, actively resisted his arrest, and posed a threat of serious physical harm. *Graham*, 490 U.S. at 396. Young's actions necessitated the use of force in response. And the officers reasonably determined, in that moment, that deadly force was necessary to alleviate the threat of serious physical harm to Officer Braun.

---

[7] The record apparently does not contain a more precise representation or depiction of the skewer, or at least the parties haven't pointed the Court to that evidence. But as discussed below, this gap is immaterial because the parties agree that the object, whatever its dimensions, posed a potentially dangerous threat to Officer Braun.

The Sixth Circuit recently addressed a similar (and similarly tragic) situation in *Baker v. City of Trenton*, 936 F.3d 523 (6th Cir. 2019). Following a concerned call, officers visited and entered a home where an 18-year old high schooler, who was suspected of criminal activity, was acting erratically. *Id*. at 528. The officers reached the top of a flight of stairs, while the suspect stood at the bottom. *Id*. As the officers stepped down the stairs to subdue him, he lunged at the officers with a lawnmower blade that he was "swinging erratically." *Id*. After one officer fell, the suspect struck him with the blade. The officer then fatally shot the suspect. *Id*. at 528–29. The Sixth Circuit affirmed the grant of summary judgment to the defendant officer, holding he did not use excessive force as a matter of law:

> [Officer] Driscoll had just been struck by a potentially lethal object, and faced the risk of being struck again …. [A]lthough his fellow officers had successfully retreated, Driscoll was in no position to back away from the encounter …. Driscoll had fallen down and was in a vulnerable position. Because [the suspect] was armed and was at that moment engaged in violence against Driscoll (and further, because previous attempts to nonlethally subdue [the suspect] had failed), Driscoll justifiably acted in self-defense.

*Id*. at 535. Here, as in *Baker*, Officer Braun "was in no position to back away" when Young suddenly lunged at him. As in *Baker*, Officer Braun was attacked with a "potentially lethal object." As in *Baker*, Young was "armed and … engaged in violence against" Officer Braun. And as in *Baker*, the officers shot Young in self-defense.

**2. Events preceding the use of force.** Instead of focusing on the moment of the shooting, the Estate principally argues that the officers recklessly created the conditions that caused the deadly encounter. According to the Estate, the officers' decision to enter the abandoned home, armed but warrantless, and run up a "fatal funnel" with no "opportunity for orderly retreat" (as the Estate describes the stairwell) "was part and parcel of their decision to shoot Mr. Young." Response at 7, 21. To ward off summary judgment, the Estate urges the Court to adopt a more expansive view of the actions that comprised and caused the officers' use of force.

However persuasive this account might be as a matter of logic, it fails as a matter of law. Binding law of the Sixth Circuit squarely rejects the Estate's invitation to examine the causal contribution of officer decisions preceding the shooting by several minutes. Courts in this Circuit assessing the constitutionality of force must consider only whether the "seizure" itself was justified when the officer acted. *See Livermore*, 476 F.3d at 407 (examining officer's "split-second judgment" to deploy deadly force). The actions that occur in the "hours and minutes" leading up to the use of force are "immaterial." *Id*.; *see also Lemmon v. City of Akron*, 768 F. App'x 410, 417 (6th Cir. 2019) ("[T]he events leading up to the [deadly encounter] are immaterial to the issue of whether [the officer] reasonably used deadly force[.]"). These preceding actions, in order to be redressable in court, would have to independently violate the Fourth Amendment (or some other constitutional provision).

The Sixth Circuit, in *Livermore*, rejected the Ninth Circuit's alternative approach, which would allow excessive-force claims to proceed "if the defendant police officers acted recklessly in creating the circumstances which required the use of deadly force." *Livermore*, 476 F.3d at 406. The "proper approach under Sixth Circuit precedent," the court described in *Livermore*, "is to view

6

excessive force claims in segments." *Id.* (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996), and *Gaddis v. Redford Township*, 364 F. 3d 763, 772 (6th Cir. 2004)).

The Supreme Court, though reserving judgment on the precise question the Estate raises, recently took a similar tack in *Mendez*. *See* 137 S.Ct. at 1547 n.*. The Court rejected the Ninth Circuit's "provocation rule," in which a "separate Fourth Amendment violation may render the officer's otherwise *reasonable* defensive use of force *unreasonable* as a matter of law." *Id.* at 1546. The unanimous opinion in *Mendez* is consistent with the temporal distinction drawn in *Livermore*: "[T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional." *Id.* at 1547.[8] Earlier constitutional violations "cannot transform a later, reasonable use of force into an unreasonable seizure." *Id.* at 1544.

Here, the Estate did not assert a separate constitutional claim with respect to the officers' preceding actions. Rather, it rolled those actions into its account of why the officers used excessive force in ultimately shooting Young. The Estate's summary judgment brief spilled considerable ink describing alleged LMPD policy violations regarding the officers' entry into the home. Response at 9–15. This appears to hint at a Fourth Amendment warrantless entry claim, although the Estate does not explicitly state it. Even if policy violations could support a Fourth Amendment warrantless-entry claim, however, Young's Estate would lack standing to bring such a claim. Young had no legal right to be in the abandoned house, and therefore lacked a privacy interest that would allow him to object to the officers' entry. *See United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (Defendant "did not have a legitimate expectation of privacy by virtue of having stayed a week in the vacant premises that he did not own or rent."); *Olvera v. City of Modesto*, 38 F. Supp. 3d 1162, 1170 (E.D. Cal. 2014) ("[A] squatter lacks standing to contest a search of the structure in which he or she is squatting[.]"). For that additional reason, the Defendants' summary judgment motion needn't overcome the Estate's arguments regarding whether the officers lawfully entered the house in order to show the shooting was a reasonable response to an imminent threat of physical harm.

The Estate's attempts to reformulate this temporal distinction are unpersuasive and unsupported.

Citing *Yates v. City of Cleveland*, the Estate's brief asserts that a court's excessive-force analysis may include an earlier unreasonable entry and other actions that may have led to the use of force—at least if not much time passed in between. Response at 20 (citing 941 F.2d 444 (6th Cir. 1991)). But *Yates* involved "actions preceding the shooting" that occurred much more rapidly—mere seconds before the shooting. The officer in *Yates* entered a poorly-lit house at 2:45 a.m. without identifying himself as a police officer or using a flashlight. *Id.* at 447. The occupants of that house did nothing to threaten the officer, according to the Court of Appeals, and never even knew the person entering the house *was* a police officer (rather than an intruder) during the brief moments between the entry and shooting. The nature of this confrontation plainly bore on the

---

[8] The Supreme Court's decision in *Mendez* noted that "[t]he provocation rule … has been 'sharply questioned' outside the Ninth Circuit," citing its earlier decision in *City and County of San Francisco v. Sheehan*, 575 U.S. ——, ——, n.4, 135 S.Ct. 1765, 1776, n.4 (2015), which itself cited the Sixth Circuit's decision in *Livermore* as offering the counterpoint to the Ninth Circuit rule later rejected in *Mendez*. 137 S.Ct. at 1546.

7

*objective* reasonableness of the officer's use of force. The court therefore rejected the officer's "subjective beliefs" regarding whether the occupants posed "an immediate threat to his safety." *Id.* (affirming denial of qualified immunity). To be sure, aspects of the reasoning in *Yates* are at least in tension with the principles set forth in *Livermore*.[9] But *Yates* preceded the Sixth Circuit decisions discussed above by many years, and nothing in *Yates* indicates that the parties distinguished the entry and the shooting in the manner the Defendants do here—or that *Yates*' vastly different factual circumstances would have supported such a distinction.

The Estate's reliance on *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011), fails for a related reason. *Bletz*, citing *Yates*, affirmed the denial of qualified immunity based on a factual dispute: whether or not a man was lowering his gun in compliance with an officer's command when the officers announced themselves and shot him. The Sixth Circuit, describing its range of precedent on this point, stated that "[w]here the events preceding the shooting occurred in close temporal proximity to the shooting, those events have been considered in analyzing whether excessive force was used." *Id.* at 752. But in *Bletz*, the court had no need to "decide precisely which preceding events … should properly be considered in analyzing the reasonableness of [the] use of deadly force"; the alleged facts regarding "the moment immediately preceding the shooting" force created a factual dispute that precluded qualified immunity. *Id.*

Here, much more time elapsed between the shooting and the preceding actions that the Estate claims were unreasonable., The law therefore views the separate actions as separate (potential) constitutional violations. *See Livermore*, 476 F.3d at 407 ("Under *Dickerson*, the preceding decisions made by [an officer] are immaterial and not a sufficient basis for [an excessive-force] claim under the Fourth Amendment."); *Goodwin v. Richland County*, 832 F. App'x 354, 358 (6th Cir. 2020) ("Even assuming" that "the officers made an unreasonable entry into the … home and failed to reasonably plan their tactical operation *before* putting themselves in danger," those earlier actions may not "be used to determine whether the later use of force was reasonable."). Viewing the situation from the perspective of an objectively reasonable officer, as the law requires, the Defendants surely inferred that after several minutes of noise and announcement (15 minutes since the unscrewing of the door and 3 minutes since entry into the home), anyone in the abandoned house would've understood that the individuals he attacked were likely police officers. The officers announced themselves at least four times—twice upon arrival and twice as they climbed the stairs to the second floor. Braun Bodycam at 13:49; 14:00; 16:41; 16:44. They used flashlights. They searched the house for several minutes after spending several more minutes outside, attempting to contact Young. Each step separated the entry and search of the house from the shooting of its occupant. The law offers no basis for conflating the two. *Cf. Mendez*, 137 S. Ct. at 1547 ("This approach mistakenly conflates distinct Fourth Amendment claims. Contrary to this approach, the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional.").

The Estate's inchoate search claim aptly illustrates the search/seizure distinction applied by the *Livermore* line of authority and echoed in *Mendez*. If Young lawfully occupied the home

---

[9] *See Yates*, 941 F.2d at 447 (Given plaintiff's "right not to be shot by an officer unless he posed a threat to the officer or to others," "[i]t was not objectively reasonable for [the officer] to enter the dark hallway at 2:45 a.m. without identifying himself as a police officer, without shining a flashlight, and without wearing a hat.").

8

the officers entered three minutes before the shooting, he conceivably could have raised two colorable constitutional claims: one for the entry (search) and another for the shooting (seizure). The unlawful entry was not "part and parcel" of an unreasonable use of force several minutes later, *contra* Response at 21.

In the end, the Estate more-or-less acknowledges that the law limits this Court's excessive-force analysis to the circumstances immediately surrounding the officers' use of force. It states that "this case highlights all the problems with an overly restrictive application" of a narrow excessive-force analysis, and that "[i]f the law does not incentivize the police" to avoid circumstances where they put people at risk of harm, "then the law must change." *Id.* at 2, 21. The Estate is correct that this Court is bound by precedent. And those precedents require the Court to examine only the circumstances immediately preceding the officers' use of force in an excessive-force analysis. *See Livermore*, 476 F.3d at 407. This case offers no basis for the Court to distinguish or depart from that binding precedent.

### B. State Law

Given that the police officers' use of force was objectively reasonable under the Fourth Amendment, none of the Estate's state-law claims survive summary judgment.

First, the Estate's battery claim fails because Kentucky law does not recognize such a tort claim against an officer if the officer's conduct was objectively reasonable under the Fourth Amendment. *Reich v. City of Elizabethtown*, 945 F.3d 968, 983 (6th Cir. 2019) (citing *Atwell v. Hart County*, 122 F. App'x 215, 219 (6th Cir. 2005)).

Second, the Estate's negligence and gross-negligence theories do not apply in this context: a negligence claim under Kentucky law cannot coexist with a Fourth Amendment excessive-force claim based on the same conduct. As other decisions in this District have recognized, the Estate is "incorrect in [its] assertion that a police officer's use of excessive force can be analyzed as a negligence claim." *Ali v. City of Louisville*, No. 3:05-cv-427, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006); *see also Woodcock v. City of Bowling Green*, 165 F. Supp. 3d 563, 605 (W.D. Ky. 2016), *rev'd on other grounds*, 679 F. App'x 419 (6th Cir. 2017). "When [the officer] deliberately exceeds the privileged amount of force by committing an unwarranted violence on the arrestee, he is liable for the tort of battery, not for negligence." *Turner v. Hill*, No. 5:12-cv-195, 2014 WL 549462, at *10 (W.D. Ky. Feb. 11, 2014). This is true because "each time an officer uses force, he commits an intentional act of battery for which he is liable, *unless* he is clothed by a privilege permitting him to use a reasonable amount of force." *Ali*, 2006 WL 2663018, at *8 (emphasis added). If a plaintiff's battery theory fails because the officer used reasonable force, then the law of negligence does not offer a fallback tort based on those same intentional actions. *See Turner*, 2014 WL 549462, at *10. ("To permit a separate claim for negligence premised on the same conduct by the officer is logically and doctrinally unsupportable.") (collecting cases). The Estate's negligence theories necessarily fail given their incompatibility with the Estate's arguments regarding the Defendants' intentional use of force against Young.

Third, and finally, the Estate's summary-judgment response raises (for the first time) a negligence per se claim. Response at 23. Causes of action, of course, must be pled in an initial or amended pleading, and not in a legal brief. *See Tucker v. Union of Needletrades, Indus. & Textile*

*Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).") (quoting Wright & Miller, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)). This claim is therefore not properly before the Court and cannot save the case from summary judgment.

And even if the Estate had properly pled this claim, it would still fail. Kentucky's negligence per se statute provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation…." KRS § 446.070. This statute "creates a private right of action in a person damaged by another person's violation of any statute that is penal in nature and provides no civil remedy, if the person damaged is within the class of persons the statute intended to be protected." *Hargis v. Baize*, 168 S.W.3d 36, 40 (Ky. 2005). The statute underlying the Estate's new theory is KRS § 503.090(2): permitting "deadly physical force" if an officer has the authority to make an arrest, the arrest concerns a felony involving the use of physical force, and the officer believes the arrestee will endanger human life unless immediately apprehended. As several courts have concluded, however, KRS § 503.090 cannot serve as a negligence per se predicate because the statute was not intended to regulate conduct—it merely provides a defense for an otherwise unlawful use of force. *See Anderson v. City of Fulton*, No. 5:18-cv-32, 2020 WL 7038580, at *12 (W.D. Ky. Nov. 30, 2020); *Clark v. Kentucky*, 229 F. Supp. 2d 718, 728–29 (E.D. Ky. 2002).

## V.  Conclusion

The Court **GRANTS** Plaintiff's motion for leave to supplement its response (DN 73) and **GRANTS** Defendants' motion for summary judgment (DN 65) on all remaining counts.

Benjamin Beaton, District Judge
United States District Court

July 1, 2021

cc:   Counsel of Record

10